FRED A. HARTWICK, Appellant, v. SEWARD HARTWICK et al., Appellees.

No. 41925.

FEBRUARY 6, 1934.

H. C. & H. C. Taylor, for appellant.

T. A. Goodson, and Clark & Bean, for appellees.

ALBERT, J.—In 1908, and for some time previous, Frank M. Hartwick and Fred A. Hartwick (brothers) were the owners of a 164-acre farm in Davis county, Iowa. Frank resided in Clinton, Michigan, and Fred in Moline, Illinois, and Fred looked after the renting of this farm.

In November, 1926, Fred commenced an action in partition. That action was settled by stipulation and decree based thereon. The material part thereof with which we are concerned in the

present case was a provision that Fred was indebted to Frank in the sum of $1,500, which amount, under the stipulation, was made a lien on Fred's share in the aforesaid tract of land. When that settlement was made, it was decreed that Nels W. Hartwick, another brother, who lived near this land, should look after the same for both Fred and Frank, which he did until the date of his death on December 19, 1929. Immediately after the death of Frank (March 7, 1930), Fred instituted the present action for the partition of this land. Frank, prior to his death, made a will, which was duly probated in Michigan, willing all his property to his wife, Christina V. Hartwick, who is a party defendant to this action. She filed an answer to this case, and it is stipulated that she and Fred each own an undivided one-half interest in the land in controversy, but in her answer she asserts that she has a lien on Fred's share for the $1,500 referred to above. In reply to this answer Fred pleads the payment of the aforesaid $1,500, and that said debt was fully settled and discharged on the 28th day of January, 1930, and to sustain this.charge he pleads a writing purporting to be signed by Frank and Fred Hartwick, as follows:

"This closes the books for N. W. Hartwick with $1,500 lien paid in full.

"[Signed]  Frank Hartwick
"F. A. Hartwick."

For reply to this answer, Christina V. Hartwick denies that Frank Hartwick ever signed the statement in the book where it states:

"This closes the books for N. W. Hartwick with $1,500 lien paid in full."

She denies the purported signature of Frank Hartwick and specially denies the genuineness of the signature of Frank Hartwick affixed thereto and states that the signature of Frank Hartwick is not the signature of Frank Hartwick. This pleading was under oath. During the trial Christina amended her answer to the reply for the purpose of conforming the pleadings to the proof and to make her answer thereto filed more definite and specific. She renews her denial of the genuineness of the signature of Frank Hartwick to said writing, pleads that said writing was materially altered and changed by adding thereto the words "with $1,500 lien paid in full,"

and says that said instrument did not constitute settlement, satisfaction, or release of the lien by Frank Hartwick against the interest of Fred Hartwick in the premises described.

The district court in the instant case, under the agreement of parties, held that Fred and Christina are each respectively the owners of an undivided one-half interest in the property. It further found under the evidence that the aforesaid $1,500 lien against the share of Fred had never been paid and satisfied, and decreed accordingly. Hence this appeal by Fred Hartwick.

From the foregoing statement, it will be seen that the real contest in the case is over the writing purported to be signed by these two brothers. This writing was attacked from two angles: First, that the signature of Frank Hartwick was not his genuine signature; second, that if it was found to be his genuine signature, the written instrument had been materially changed and altered since he signed the same.

On the death of the brother Nels, who died in December, 1929, Frank and his wife, Christina, came to Iowa to attend the funeral. They stayed over for some time thereafter at the home of Nels, whose children were Mae and Harry Hartwick. On the 22d day of January, 1930, Frank was taken sick at the former home of his brother Nels. This alleged writing was made at that place about the 28th day of January, 1930. On the 3d of February following, Frank was taken to the hospital at Centerville, and from thence to his home in Michigan, where he died on the 7th day of March, 1930.

The crux of this lawsuit lies in the facts and circumstances surrounding the making of this writing. The details of the testimony in relation thereto cannot, of course, be set out in full. The substance of the appellant's evidence is that on the 28th day of January, 1930, this writing, as it appears, was properly signed by the brothers Frank and Fred. To support this contention the appellant produced Mae Hartwick, who testified in substance with reference to this tract of land that she kept the books for her father (Nels), noting all transactions in relation thereto. This book is introduced in evidence and one page contains the writing in controversy. While Fred attended the funeral of Nels, he went home to Moline and came back about the 28th day of January. Frank was then sick in bed, and, on the arrival of Fred, the two brothers, alone in the bedroom, had a discussion of their business affairs lasting possibly an hour or longer, whereupon the witness Mae Hartwick was called

to the bedside of Frank and he stated to the witness, in the presence of Fred, that settlement had been made between them and that he wanted the witness to put it in the books. Frank dictated to the witness what she was to write and she laid the book on the bed and wrote as he dictated; and she testified that her uncles (Frank and Fred) both signed the same, that she saw Frank Hartwick sign the same, as did Fred. After the signing of the same:

"Frank had the old contract in his hand, and he said, 'Your father is dead and you can close the books now. The contract is of no value.' The contract referred to the $1,500 lien. My brother Harry was present in the room at the time." (Witness identified the $1,500 contract, or copy thereof. This was the stipulation on which the first decree was entered, fixing the $1,500 lien on Fred's share.)

"At the time he had the contract in his hand and handed it to me and stated that it would not be of any more use. He said it was all done now and they would start new, and Frank asked my brother Harry if he would look after his business with reference to the farm for a time, and Uncle Fred would do his own. At that time Frank had some money in his hand. I don't know how much. It was given to him by Fred. There were some bills and some silver. This money was given by Fred to Frank when we first went into the room."

On cross-examination she testified:

"At the time Frank came to our house he seemed quite well. Took sick about a month after he arrived. I think he had been in bed a day before the 28th."

After this alleged settlement witness went to Ottumwa and Fred drove as far as Belknap.

"Frank showed me the money and said he had settled and I saw Fred give it to him. I did not count it or inquire how much. There was some money on hand belonging to them and some in the bank. I wrote Fred Hartwick a check for one half of the partnership land, $43.75, and Frank's check for $43.75 plus $37.50. I did the writing with a pen and ink. I remember setting the ink bottle on the window and dipping into it. I bought the pen a long time ago and bought the ink at Welch's store. The bottle had a cork in it."

The witness was adjusting certain matters in her father's books

and did some writing therein aside from the writing in controversy. She continued:

"I just can't recall. I was almost on the verge of collapse myself at my father's death. The writing was all done with the same pen and same ink. I think Fred and Frank both used the same pen when they signed. Frank signed first and then Fred."

After the book was signed by Fred he handed it to the witness.

"I just saved it. I did not make Fred a copy of the entry. I gave them each one the book to turn through and see that everything was square. Frank told me that he and Fred had settled and he wanted me to write the settlement in the book and he opened his hand and showed me the money but I didn't count it. Tena wrote a letter back. It seems as though they had sent the money home and they expected to go home when he had to go to the hospital. He told Harry that he might not have saved back money enough to meet all expenses, and he said, 'If I shouldn't have, may I borrow of you until I get home, and I will send it as soon as I get home?' Harry gave him his check book and said, 'Yes, write your checks, what you need.' As to the $54 item (hospital bill) I think Aunt Tena wrote it to me in a letter or that Frank said to take it out of the rent. In the conversation between Frank and Harry, Frank said they had sent their money home, and he became worse and was unable to go and we were afraid he hadn't kept enough since he had found he had to go to the hospital, and he asked Harry before he went to the hospital whether or not he could help him or let him have money until he got home, and Harry gave him his check book and told him to use what he wanted. I don't know when Aunt Tena sent the money home, nor how much, or whether it was by express, parcel post, special delivery, or how."

The substance of Harry Hartwick's testimony is that when Fred came to the house, on January 28th, he told Harry that he had come to settle with Frank.

"Frank was sitting up in bed at the time. Fred was there about two hours and Fred and Frank were alone in the room for an hour. I heard them talking but paid no attention to what they were doing. Finally Fred came out and called Mae and me in the room. After we went in Frank told me that he had settled and that Fred had

paid him the $1,500 in full and settled everything, and he wanted me to look after his part of the farm. There was nobody present except Mae and me and Frank and Fred. Frank told Mae what to write in the book and she read it to them to see if it was right. I heard her read it." (The writing in controversy was here presented to the witness, who testified that it was read by his sister and he saw his two uncles sign it.)

"Before it was signed Fred handed Frank a handful of money, paper bills and silver money, mostly bills. There was more than one or two bills. There was a whole lot of them. I didn't see the denominations of the bills, but it looked like a good deal of money. I saw my sister give Frank some money for rent after that. Frank told Mae what to write, and after she had written she read it to them. Frank signed it in bed and Fred took it and signed it. After it was signed Frank said that he was glad it was settled and Fred now owns his part of the farm clear, and we own the land, each one half of it. He wanted me to look after his half and Fred to look after his half. Mae and I then went to Ottumwa and Fred went with us as far as Belknap. Mrs. Hartwick stayed with us in our home till Frank went to the hospital. I let Frank have money while he was at the hospital, gave him my check book and told him to take all he wanted. He had to borrow some money, said he didn't know how much he wanted, and I said, 'I will just give you a check book and you can check for what you want.' If he checked any of it I took it out of the rent. I have seen the entries on that book, hospital bill $54.00, fares $25.05; another entry of fares $105.75. I got that out of the rent. When I took Fred in Frank's room he was not bad then. He could have gotten up himself. Frank's wife was in the house but not in the room. Frank told me that he had settled with Fred, that he paid him $1,500 in full. Frank was counting the money himself, he had it in his hand. Mae gave him some more, just a little bit. He was putting the bills down one at a time. I never asked Fred where he got the money. He had it in his hand when I first saw him. When I went into the room Fred handed Frank a bunch of money. After the writing was made Mae said, 'You can sign now, Frank.' She said first, 'Who wants to sign first?' and Fred said, 'let Frank sign first.' He said then, 'You sign it,' and Frank signed it. I claim that Frank dictated all those words, 'This closes the book for N. W. Hartwick with $1,500 lien settled in full.' I heard Frank say it and I seen Mae write it. She wrote

it all at one time. Fred did not ask for a receipt for the $1,500 that I heard, only for the book to be delivered to him. The words last above quoted were there when the name Frank Hartwick was placed there at the end of those three lines, and the words and writing were at the time of the signature in the same condition as it now is, and it was read over before it was signed. There has been no change or alteration of those words there and the writing there from the time it was signed until this time. They were just the same as they are now. I say Frank and Fred put their names there."

The writing in question was then offered in evidence and the plaintiff rested.

The substance of the testimony of the appellee Christina Hartwick, so far as material, is that her husband, Frank, was sick in bed since January 22, 1930; that he was attended by a doctor; and that he had a temperature running over 100. She accompanied him to the hospital in Centerville, and then to their home in Michigan. It was almost a year after her husband's death that she learned of the present action. In March, 1930, she received a letter from Fred, which, after acknowledging receipt of the death message, and expressions of sorrow, continued:

"Well now since Frank's death we will have to make some changes. Did he leave a will or papers of any kind or did he make any request what he wanted done with the land, the taxes are now due, I would like to know if he left any request so I will know how to meet the obligation."

She testified:

"During that sickness Frank and Fred had a conversation. It was about Harry taking his father's place in handling the 164 acres. I do not think it extended over half an hour. I was not present and did not hear what they said. There never was a time when Harry and Mae Hartwick were called in by Fred Hartwick and stayed in there for any length of time. Never a time when the three of them stayed in there for an hour or two. During that sickness there was no time when Frank had about him any considerable money, a big handful. Never was a time when any money or funds were sent home by either of us. I asked Harry if he could help me until I got some money back. He said he would let me

take his check book. I drew checks for hospital bills, I think $54. I am acquainted with Frank's signature." (The witness then identified several of the genuine signatures.)

"The signature Frank Hartwick on the book and the writing in question is not Frank Hartwick's writing. I would say it is not his genuine signature."

This witness, in testifying to a written transfer of the automobile to the witness by Frank while he was in the hospital at Centerville, said:

"He knew me all the time, and the other parties around at the time. He was in strong physical condition. He knew everything he was saying and doing. During all the time that Frank Hartwick and I were in the home of Harry Hartwick, Frank was in bed, not out of bed at all. Fred Hartwick was there. I remember he went in the room and talked to my husband and they talked about the farm they owned jointly. Fred was in there at one time with the door closed. There was no one in the room at that time but the two men. Talked about something in connection with the farm. I helped about the housework. From January 25, 1930, on down until we left there my husband was a sick man. While my husband was sick I was not out or away from home other than a trip to Bloomfield to get a fever thermometer. There never was a time there when Fred Hartwick came and went into the room of Frank Hartwick and stayed for an hour or two. Harry and Mae were never called into my husband's room at any time when Fred Hartwick was there and the door to the room was never closed. There was no time there when my husband had any considerable sum of money, or handful, or roll of bills about him, and no money was sent home by either me or my husband. When I took my husband to the hospital we did not have sufficient funds to pay his doctor bill, so I asked Harry Hartwick for some money, if he could help me with some money until I got back home, and he authorized me to draw checks on him for what I needed. I drew a check on Harry for $54, and I sent him a check for that immediately upon reaching home, and he returned it and stated that he would take the amount out of the rent money."

Paul Howell, a witness for the appellees, testified that he is a mail carrier on the route which led past the Fred and Frank Hartwick farm.

"I bought corn from Fred in January 1930, and made settlement for it. Gave Fred Hartwick two checks in settlement of the corn, one made to Fred and the other to Frank."

On January 28, 1930, when he reached the Hartwick farm, Fred was there.

The witness Hockersmith testified that he is assistant cashier in the Bloomfield bank. He testified as to the check above referred to, to Frank Hartwick, that it was cashed in his bank on the 30th of January, 1930.

The witness Kimball testified that he is president of a bank in Clinton, Michigan, and has been such for forty-one years. He is acquainted with the signature of Frank Hartwick, who was a customer of the bank, and identified certain instruments as bearing the true signature of Frank Hartwick, and as to the writing in dispute here, he testified:

"I would not recognize that signature as being his, and the same is not the signature of Frank Hartwick."

As to the signature in controversy, this witness further says:

"I suppose it is perfectly possible that this signature could have been written by Frank in an enfeebled condition, from sickness, or otherwise."

Frank W. Hogan, another witness living in Clinton, Michigan, and vice president of the State Savings Bank, said that he knew Frank Hartwick for ten or fifteen years; that he was a depositor in his bank, and he was familiar with his signature. As to the signature in controversy, he was asked whether or not he would identify that as the signature of Frank Hartwick. His answer was:

"Well, now, I really don't believe that is Frank's signature. It don't look like his signature. If it was he certainly was awfully nervous. He was not in his usual condition. If it had been presented to me I would not have accepted it without investigating it pretty thoroughly first. I don't believe I would say that was Frank's signature."

On cross-examination he said that a man's physical condition at the time he writes his name often affects the appearance of his signature; that if a man is enfeebled or sick, his signature does

not appear as his normal signature. On being presented with Frank's signature on the photostatic copy of his will, he said:

"I think that is his signature all right. These gentlemen here, I know both of them, they were witnesses to that. I think that is his signature all right. If he wrote it he was either in a nervous condition or affected by ill health. He must have been."

Another witness, Maddy, an attorney at law, said he has been making a study of questioned documents and handwriting for fourteen or fifteen years. As to the writing in question he said that, if all of this writing was written at the same time, there was a change of ink during the process.

"The words 'with $1,500 settled in full' was written with different ink or ink in a different condition. The writing of the first part of the clause the ink flowed freely and last part ink was congealed or thick. The last part of the second line and the entire third line is written in a cramped slow hand, in a crowded position. It shows too much care and too slow a motion to have been freehand. Also the writing is crowded between the lines more than anything else and shows to me it was written in after."

Another witness, Shaw, who was a commercial photographer and had handled document cases, pointed out certain things in the writing and said that certain parts were somewhat crowded, and pointed out what he called certain distinguishing features as to certain letters in the words. He testified as to the kind of ink and its flowage, and that in part of the writing the ink was not in the same fluid condition as in the other part. He made some enlarged photographs in which he pointed out the defects he saw in the writing.

In rebuttal the witness Maish testified as an expert on questioned documents, and from his experience in the banking business, in which he has spent most of his life, and after having inspected the document in question, said that in his judgment the words therein were written at the same time and by the same person. He testified that in his opinion the apparent difference in the ink grew out of the fact that the ink was not fresh, but that when it sets awhile it separates and that the pen may have been dipped in deeper and got some of the sediment in the bottom of the bottle.

H. C. Brown testified in substance that he measured the spacing

of the words and letters in this document and that from such measurement and the punctuation, in his opinion same was written by the same person, with the same pen and ink, at the same time.

We have also before us the original exhibits in the case, including the original writing in controversy. From a careful review of the evidence and a comparison of the writings before us, we reach the undoubted conclusion that the signature of Frank Hartwick to the instrument in question was his genuine signature.

As to the other issue in the case, whether or not there was a material alteration of the writing after it was signed by Frank Hartwick, a conclusion thereon cannot be reached without giving attention to the law governing such issue. A question is raised as to the right to file any amendment at the time it was filed raising this issue, but in view of the conclusion we reach in this case, it is not necessary for us to pass on that question.

It is a fundamental doctrine in this state that where one seeks to raise an issue of this kind, he has the burden of alleging and proving the same. Turning to the pleading filed in relation to this matter, we find it in the following form:

"Comes now Christina V. Hartwick * * * and for the purpose of conforming the pleadings to the proof and to make her answer heretofore filed more definite and specific, states the following:

"She renews her denial of the genuineness of the signature of Frank M. Hartwick to the writing set forth in plaintiff's reply and does not, by this pleading, admit the genuineness of said signature or that said Frank Hartwick ever signed the instrument, and she further states that after the name 'Frank Hartwick' was signed thereto, said instrument was materially altered and changed by adding thereto the words 'with $1,500.00 lien settled in full,' and because of all of said matters, together with those hereinbefore pleaded by this defendant, said instrument did not constitute a settlement, satisfaction or release of the lien held by Frank Hartwick against the interest of Fred Hartwick in the premises hereinbefore set forth and described in the pleadings herein."

In the case of Tharp v. Jamison, 154 Iowa 77, 134 N. W. 583, 39 L. R. A. (N. S.) 100, this court said:

"An erasure or alteration apparent upon the face of the instrument raises no presumption that it was made after delivery. * * *

The contention of the appellant at this point is that the only burden upon him is to show that an alteration was in fact made, and that the burden is then cast upon the plaintiff to show that such alteration was made before delivery or otherwise to explain or excuse. There are some jurisdictions where this rule is maintained. (Citing cases.) None of these cases sustain appellant's contention in this respect. Some of them are cases wherein the alleged alteration was shown to have been made after delivery, and where the burden of explanation was thereby thrown upon the party offering the instrument. But none of them dispense with the necessity that it be made to appear that the alleged alteration was made after delivery before any presumption of fraud can arise therefrom."

In Monona County v. Gray, 200 Iowa 1133, 206 N. W. 26, this court said:·

"It is the settled rule in this state that an alteration apparent on the face of an instrument raises no presumption that it was made after delivery, and that the burden is upon the party alleging a material alteration to establish that it was made after delivery of the instrument. * * * Mere proof that an alteration was in fact made is not sufficient to cast upon the party relying on the instrument the burden to show that it was made before delivery, but it must be made to appear that the alleged alteration was made after delivery, before any presumption of fraud arises therefrom. * * * 'The fact that an alteration appears, without showing that it was a material alteration, made after delivery, would not defeat recovery, even though made by the plaintiff.'"

In Council Bluffs Savings Bank v. Wendt, 203 Iowa 972, 213 N. W. 599, it is said:

"'* * * The burden is upon the party alleging the material alteration in such written instrument to show that it was made after delivery of the instrument."

The same doctrine is announced in In re Estate of Thorne, 202 Iowa 681, 210 N. W. 952.

Referring now to the pleading filed and just above set out, it will be noticed that it is not pleaded that the instrument was altered after its execution, or that, if it was altered after its execution, the consent of Frank Hartwick to such alteration was not given. With

this rule in mind we turn to the testimony heretofore set out. As above shown, the burden was upon the appellees to show, first, that there was a material alteration, and, second, that such alteration was made after the instrument had been duly executed by Frank. We find it is apparent from the foregoing that the appellees have failed to sustain their burden of proof on this issue. In fact, as we read the record, the weight of testimony tends to show that there was no material alteration of the instrument in question, and, in reaching this conclusion, we do not lose sight of some testimony that was introduced by way of assessment rolls made out by Fred in the year in question.

The district court having reached the contrary conclusion, we find that it was in error in relation thereto, and its action is reversed.

CLAUSSEN, C. J., and KINDIG, DONEGAN, and EVANS, JJ., concur.